# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **MICHAEL MCCANN, et al.,** ) | |
| **on behalf of J.M., a minor,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **2:18-cv-00336-JDL** |
| ) | |
| **YORK SCHOOL DEPARTMENT,** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## ORDER ON YORK SCHOOL DEPARTMENT'S MOTION TO DISMISS

This matter is before the Court on Defendant York School Department's ("the School Department") Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted (ECF No. 9). The School Department seeks dismissal of all three counts asserted against it in the complaint by Plaintiffs Michael and Erin McCann ("the McCanns"),[1] on behalf of their minor son, J.M. Those counts include violations of Title IX, 20 U.S.C.A. § 1681 (West 2019) (Count I), Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794 (West 2019) (Count II), and the Fourteenth Amendment of the United States Constitution (Count III). Because I conclude that the complaint states a plausible claim for violations of Title IX and Section 504, I deny the School Department's motion in part, as to Counts I and II; however, I grant the School Department's motion as to Count III.

---

[1]  In addition to York School Department, the complaint names Timothy and Julie McCann, individually and on behalf of D.M., a minor, as Defendants. Because I refer only to Plaintiffs Michael and Erin McCann in this Order, all references to "the McCanns" are to the Plaintiffs.

# I. FACTUAL BACKGROUND

The complaint alleges the following facts, which I treat as true for purposes of the motion to dismiss.

J.M. has experienced difficulties with anxiety and attention for many years. In 2013, the same year J.M. started middle school, he was diagnosed with Attention Deficit Hyperactivity Disorder – Inattentive Type (ADHD) and anxiety, which the complaint alleges qualifies as a disability under Section 504 of the Rehabilitation Act, 29 U.S.C.A. § 794 (West 2019).[2] Also in 2013, the School Department created a Section 504 Plan[3] for J.M., which provided accommodations for him including additional time for certain tasks and permission to take breaks when he was feeling anxious.

Beginning in middle school, J.M. was subjected to bullying and harassment from fellow students because of his "perceived nonconformance with conventional gender norms and stereotypes." ECF No. 1 ¶ 9. During one incident, which took place during a school-sponsored overnight trip with J.M.'s 7th grade class, the boys with whom J.M. shared a bunk room "defil[ed] J.M.'s pillow with their genitalia" and threw water on him, and then said that J.M. had urinated himself. *Id.* ¶ 10. The boys threatened to beat J.M. up if he reported them, but J.M. did tell a chaperone

---

[2] The regulations that implement Section 504 of the Rehabilitation Act, as it applies to public schools, appear in 34 C.F.R. Part 104. *See* 34 C.F.R. §§ 104.1-104.2 (West 2019). As relevant here, those regulations define a "handicapped person" as a person who "has a physical or mental impairment which substantially limits one or more major life activities." § 104.3(j)(1). Schools are required to evaluate each student individually to determine whether the student needs additional services "because of [their] handicap." *See* § 104.35.

[3] A Section 504 Plan documents the services and accommodations that a school will provide for an eligible student pursuant to Section 504 of the Rehabilitation Act. *See* ECF No. 14-1 at 3.

what had happened. The chaperone informed School Department officials about the incident.

Later that same school year, J.M. and his parents complained to the School Department multiple times about other bullying, including an incident where one student videotaped J.M. being physically assaulted by another middle school boy. During a separate bullying incident, J.M.'s iPad was destroyed. J.M.'s parents ultimately withdrew J.M. from York Middle School at the end of his 7th grade year because they felt that the School Department had failed to adequately investigate or address the bullying issues. That summer, J.M. began seeing a mental health counselor.

In August 2017, J.M. enrolled in 9th grade at York High School. Before the school year began, J.M.'s parents contacted the School Department to discuss changes to J.M.'s Section 504 Plan and to address J.M.'s anxiety and their concerns about his physical safety at school. The School Department did not immediately respond. Meanwhile, beginning in August, J.M. was bullied and harassed by a group of 9th grade girls and a 9th grade boy, G.M. That same group of 9th grade girls then started exchanging social media messages with J.M. and some of his friends. One message referred to G.M. as a "fag," and the girls then forwarded that message to G.M., who shared it with his mother. G.M.'s mother told the School Department that J.M. was bullying G.M. Shortly after that incident, G.M. told J.M. that he would have his older brother, D.M., beat up J.M. In September, G.M. and his friends' harassment of J.M. intensified. They taunted J.M. and called him names such as "bitch" and "cunt." *Id.* ¶ 20. After one bullying incident in late September, J.M. became so distraught that

he left school and walked home, after which J.M.'s parents reported the bullying to the school's Section 504 Coordinator and the school resource officer.

On October 3, 2017, the School Department convened an emergency Section 504 meeting at the request of J.M.'s parents. Among those in attendance were J.M.'s parents, the Assistant Principal, who is also the school's Section 504 Coordinator, the school counselor, and several teachers. After the meeting, J.M.'s Section 504 Plan was modified to provide that the School Department would work with J.M. to identify a safe place and a trusted adult for him to go to when he felt anxiety. The new Section 504 Plan also stated that J.M. could "access the school social worker and/or his school counselor as necessary." *Id.* ¶ 23.

In the days that followed the emergency Section 504 meeting, G.M. and the 9th grade girls continued to harass J.M. and call him a "bitch" and "cunt." *Id.* ¶¶ 24-25. J.M. responded by giving G.M. and the girls the middle finger,[4] after which G.M. again told J.M. that he was going to have his older brother, D.M., beat J.M. up. The McCanns told the School Department and the school resource officer about the new incidents of harassment, including which students were responsible and the fact that G.M. had been threatening assault. On October 19, J.M. told both the school's Section 504 Coordinator and the school resource officer about G.M.'s threats that D.M. would beat J.M. up, and the Section 504 Coordinator told J.M. that she would "take care of it." *Id.* ¶ 29.

At the beginning of the school day on October 20, several students warned J.M. that they had heard that D.M. planned to attack J.M. later that day. J.M. went to

---

[4] The complaint does not explain whether this happened more than once.

the school counselor and told her that D.M. planned to assault him, but the counselor did not alert anyone or take any action to intervene or prevent the assault. After talking with the counselor, J.M. went to his second period class. D.M., who was not a student in the class, walked into the classroom, pointed at J.M., and said "let's take a walk." *Id.* ¶ 35. J.M. went out into the hallway, along with several other students who were yelling at J.M. that he "shouldn't have messed with G.M." *Id.* ¶ 36. D.M. then physically beat J.M., including pushing him into a glass door, throwing him against a locker and pounding his head against it multiple times, and punching him repeatedly. J.M. lost consciousness during the attack and was taken by ambulance to York Hospital Emergency Room, where he was diagnosed with a head injury, several contusions, and a dislocated jaw.

J.M. missed over three months of school as a result of his injuries. He was later found to have suffered a major concussion, was diagnosed with Post Traumatic Stress Disorder, and suffered severe emotional distress. After the assault, the Section 504 Coordinator emailed Erin McCann to acknowledge that J.M. had asked her for help. The York High School Principal also sent an email to members of the community about the assault, in which he acknowledged that the School Department had known about the "ongoing conflict" between the students involved. *Id.* ¶ 44.

## II. LEGAL ANALYSIS

To withstand the School Department's 12(b)(6) motion to dismiss, the counts asserted against the School Department must be supported by "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)). "Merely reciting elements of a claim will not do, . . . [n]or will alleging facts that are too meager, vague, or conclusory to remove the possibility of relief from the realm of conjecture." *Lydon v. Local 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014) (internal citation and quotation marks omitted). The question is whether, after isolating and ignoring legal labels and conclusions and drawing all reasonable inferences in the pleader's favor, the complaint's well-pled facts "plausibly narrate a claim for relief." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

## A.   Title IX Claim

Title IX prohibits discrimination "on the basis of sex" in educational programs that receive federal financial assistance. 20 U.S.C.A. § 1681(a).[5] "[A] recipient of funding from the United States Department of Education may be liable for damages if 'its deliberate indifference [to peer-on-peer sexual harassment] "subjects" its students to harassment.'" *Porto v. Town of Tewksbury*, 488 F.3d 67, 72 (1st Cir. 2007) (alteration in original) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 644 (1999)). To prevail on a student-on-student sexual harassment claim under Title IX, a plaintiff must show that he was "subject to severe, pervasive, and objectively offensive sexual harassment by a school peer," which caused him to be deprived of "educational opportunities and benefits," and that the funding recipient knew of the

---

[5] Title IX provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . .

*Id.*

harassment taking place in its programs but was deliberately indifferent to it. *Id.* at 72-73 (internal quotation marks omitted).

The School Department argues that the complaint fails to plausibly allege that the other students' bullying and harassment of J.M. was "on the basis of sex," and that the School Department acted with deliberate indifference. The McCanns point to several factual allegations as supporting the conclusion that the bullying of J.M. was "sex-based." ECF No. 14 at 6. First, in 2015, a group of boys bullied J.M. during an overnight trip, during which they defiled J.M.'s pillow with their genitals and poured water on J.M.'s pants, claiming that J.M. had urinated himself. Second, in 2017, G.M. and the 9th grade girls repeatedly called J.M. names like "bitch" and "cunt," which, the McCanns assert, are "derogatory terms debasing femininity." *Id.* at 5. Finally, the McCanns argue that the School Department had actual notice of the harassment and that it acted with deliberate indifference by disregarding J.M.'s reports. *Id.* at 7-8.

### 1. Sexual Harassment

I turn first to the question of whether the complaint plausibly pleads sexual harassment. The complaint alleges that J.M. was subjected to bullying and harassment because of his "perceived nonconformance with conventional gender norms and stereotypes." ECF No. 1 ¶¶ 9, 52. "[G]ender stereotyping" is a "variation of sex-based discrimination." *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989)); *see also Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049 (7th Cir. 2017) ("A policy that . . . punishes [an] individual for his or her

gender non-conformance . . . violates Title IX.").  Although the allegation that other students harassed J.M. because he did not conform with certain gender stereotypes is somewhat conclusory, it is supported by other factual allegations in the complaint.

Whether "gender-oriented conduct," including name calling, rises to the level of sexual harassment is a factual inquiry that must be tied to the unique circumstances presented in each case.  *Davis*, 526 U.S. at 651; *compare Bowe v. Eau Claire Area Sch. Dist.*, No. 16-cv-746-jdp, 2017 WL 1458822, at *3 (W.D. Wis. Apr. 24, 2017) (plaintiff stated a claim for peer-to-peer sexual harassment under Title IX where complaint alleged that classmates consistently called plaintiff "gender stereotype slurs," like "weak," "fag," and "pussy"), *with HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881 CS, 2012 WL 4477552, at *17 (S.D.N.Y. Sept. 27, 2012) (plaintiff failed to state a claim under Title IX where classmates used insults like "whore" and "bitch," but also called plaintiff multiple gender-neutral names and physically assaulted her "in a non-gender-specific way").  Here, multiple incidents alleged in the complaint involve "gender-oriented conduct."

First, the incident during the overnight trip could have resulted from gender stereotyping.  The fact that other boys allegedly put their genitalia on J.M.'s pillow and accused him of urinating on himself after throwing water on him could reasonably be considered an assertion of masculinity by adolescent boys reacting to J.M.'s perceived failure to conform to a gender stereotype.  *See* Am. Psychological Ass'n, Boys and Men Guidelines Group, "APA Guidelines for Psychological Practice with Boys and Men" 14 (2018), https://www.apa.org/about/policy/boys-men-practice-guidelines.pdf (observing that "[c]onstricted notions of masculinity emphasizing

aggression, homophobia, and misogyny may influence boys to direct a great deal of their energy into disruptive behaviors such as bullying, homosexual taunting, and sexual harassment").[6]

Next, G.M.'s and the 9th grade girls' use of gendered language like "bitch" and "cunt" when bullying J.M. also appears to be gender-based. *See Roy v. Correct Care Sols., LLC*, No. 18-1313, 2019 WL 336515, at *7 (1st Cir. Jan. 28, 2019). A plausible inference may be drawn, based on the repeated use of derogatory words that are usually used as an insult against women, that the other students viewed J.M. as effeminate.[7] Finally, this extended period of bullying culminated with a violent assault. That assault could also have been gender-based, given that it was related to the earlier name calling and other bullying. Viewing the complaint and the history of the alleged conduct holistically, it is plausible that even conduct that appears gender-neutral was motivated by J.M.'s perceived nonconformance with gender stereotypes, given the interwoven instances of gender-based bullying. The complaint, therefore, plausibly alleges that J.M. was subjected to bullying and harassment because the other students viewed him as different for failing to project the type of masculinity stereotypically associated with adolescent boys.

---

[6] As the adopted standards of a national professional organization, the American Psychological Association Guidelines provide guidance as to one plausible explanation for the conduct alleged in the complaint. I do not, however, take formal judicial notice of the Guidelines because without a more developed record, the accuracy of the Guidelines is not so obvious or established as to bring all or a portion of it within the realm of facts that are not subject to reasonable dispute. *See* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

[7] "Effeminate" is a pejorative term used to describe a man as "having characteristics regarded as typical of a woman; unmanly." *Effeminate*, Oxford Living Dictionaries, English, https://en.oxforddictionaries.com/definition/effeminate (last visited Feb. 7, 2019).

The School Department argues that "courts have held that 'gender-based' insults are not alone actionable under Title IX because they are not 'based on sex,'" and cites as an example the First Circuit's decision in *Morgan v. Town of Lexington, MA*, 823 F.3d 737 (1st Cir 2016). ECF No. 9 at 7. In *Morgan*, a middle school student was called "thunder thighs" and "hungry hippo" and had his pants pulled down in front of other students, both male and female. *Id.* at 740. But the court's Title IX analysis focused on the incidents where the student's pants were pulled down, not the name-calling. *Id.* at 745. The court concluded that, although it was possible for the alleged conduct to be viewed as sexual harassment, "no such inference [wa]s plausible" based on the facts of that case. *Id.* Even if the *Morgan* court had affirmatively concluded that the name-calling in that case was not sex-based harassment, however, that would not mean that the same is true here. The facts presented here are distinguishable from those in *Morgan* because the names "thunder thighs" and "hungry hippo" are not derogatory gender-based words, unlike the words "bitch" and "cunt."

Further, it is plausible to infer from a "consistent pattern of gender stereotype slurs" that a student's "classmates harassed him because of his failure to adhere to traditional gender stereotypes." *Bowe*, 2017 WL 1458822, at *3; *see also Hankey v. Town of Concord-Carlisle*, 136 F. Supp. 3d 52, 68 (D. Mass. 2015) (citing cases where "repeated and pervasive sexual or gender-specific comments, epithets, and/or conduct . . . so poisoned the entire body of conduct towards Plaintiff" that it was reasonable to view other facially neutral conduct as gender-based (emphasis and internal quotation marks omitted)). Whether the use of gender-based words by adolescents constitutes

sexual harassment under Title IX is a "subtle," contextual, and fact-specific question. *Bowe*, 2017 WL 1458822, at *3. At this early procedural stage, based on the well-pled facts in the complaint, it is plausible to draw that conclusion here.

## 2. Deliberate Indifference

I turn next to the question of whether the complaint plausibly pleads that the School Department acted with deliberate indifference. A funding recipient acts with deliberate indifference when an "appropriate person" receives notice of the alleged harassment occurring in the program, *Santiago v. Puerto Rico*, 655 F.3d 61, 74 (1st Cir. 2011), and the funding recipient's "response (or lack thereof) is clearly unreasonable in light of the known circumstances." *Porto*, 488 F.3d at 73.

The complaint alleges multiple occasions when J.M. or his parents reported instances of harassment to school officials. Those allegations include (1) that J.M. informed the School Department, through a chaperone, about the incident during the overnight trip in 2015; (2) that J.M.'s parents contacted the school's Section 504 Coordinator and the school resource officer in late September 2017 to report incidents of harassment, after other students had started calling J.M. "bitch" and "cunt"; (3) that after the emergency Section 504 meeting on October 3, 2017, J.M.'s parents again told the school resource officer that J.M. was being harassed, including the fact that threats of assault had been made; (4) that J.M. told the Section 504 Coordinator and the school resource officer about G.M.'s threats that D.M. would beat J.M. up; and (5) that, on the morning of the assault, J.M. reported to the school counselor that other students said the assault would happen that day.

A school official is an "appropriate person" to receive notice of harassment, for the purpose of determining liability under Title IX, when that person, "at a minimum, has the authority to institute corrective measures" and has "customary disciplinary authority" over the alleged harasser. *Santiago*, 655 F.3d at 74 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). J.M.'s alleged harassers were his fellow students. It is plausible to infer, taking the complaint in the light most favorable to the McCanns, that each of the school officials notified of the harassment by J.M. and his parents—including the Section 504 Coordinator/Assistant Principal, school resource officer, and school counselor—have disciplinary authority over students enrolled at the school. Indeed, the school counselor was specifically designated as the support person for J.M. in the Section 504 Plan. ECF No. 1 ¶ 23.

The final issue is whether the School District "fail[ed] adequately to respond" to the reports of harassment. *Gebser*, 524 U.S. at 290. The deliberate indifference standard is satisfied where the funding recipient "disregarded a known or obvious consequence of his action or inaction." *Porto*, 488 F.3d at 73 (emphasis and internal quotation marks omitted) (quoting *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). As described above, the complaint alleges that J.M. and his parents made multiple reports of harassment to various school officials beginning in 2015, including the fact that J.M. was being threatened with assault in September and October 2017. As alleged in the complaint, the only action that the School Department took in response was to convene an emergency Section 504 meeting and modify J.M.'s Section 504 Plan to provide that the school would work with J.M. to identify a safe place and trusted adult to seek out when he felt anxious. The

complaint further alleges that no action was taken in response to J.M.'s report on October 20 that he was going to be assaulted at school that day, even though he made the report to one of the adults who was identified as a resource for him in the Section 504 Plan.

It is plausible, based on these facts, that both the other students' continued harassment of J.M. and D.M.'s assault of J.M. were "known or obvious consequence[s]" of the School Department's inaction. *Porto*, 488 F.3d at 73. That J.M. and his parents made multiple reports on different occasions suggests that the bullying behavior was not likely to subside in the absence of intervention by school officials. Furthermore, because J.M. told the school counselor about the threat of assault on the day the assault actually happened, the assault was a "known consequence" of the School Department's failure to act on J.M.'s and his parents' reports. Thus, the McCanns allege that the School Department did nothing to stop known incidents of harassment to J.M. *See id.* at 74.

I conclude that the complaint plausibly pleads both that the harassment J.M. endured was based on his perceived nonconformance with traditional gender stereotypes and that the School Department acted with deliberate indifference. Therefore, the complaint states a claim for sexual harassment under Title IX.

**B.     Rehabilitation Act Claim**

The School Department seeks dismissal of the McCanns' claim under Section 504 of the Rehabilitation Act on two grounds. First, the School Department argues

that the complaint alleges the denial of a free appropriate public education ("FAPE")[8] and that the McCanns failed to exhaust administrative remedies, as required by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C.A. § 1415(*l*) (West 2019), and the Supreme Court's decision in *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 748 (2017). Second, the School Department asserts that, even if the Court finds that administrative exhaustion was not required, the complaint fails to state a claim for relief under Section 504. I conclude that the complaint does not allege the denial of a FAPE under *Fry* and that the complaint states a plausible claim under Section 504.

### 1. IDEA Exhaustion

In *Fry*, the Supreme Court addressed the scope of § 1415(*l*), the IDEA provision that "requires that a plaintiff exhaust the IDEA's procedures before filing an action under the [Americans with Disabilities Act], the Rehabilitation Act, or similar laws when (but only when) her suit seek[s] relief that is also available under the IDEA." 137 S. Ct. at 752 (internal quotation marks omitted). The Court held that IDEA exhaustion is only required where the "substance, or gravamen, of the plaintiff's complaint" seeks relief for the denial of a FAPE, and rejected a standard that simply asks "whether [the] injuries were, broadly speaking, 'educational' in nature." *Id.* at 752, 758. Several facts may be relevant to the "gravamen" analysis, including whether the complaint alleges a deficiency in the student's Individualized Education

---

[8] States that receive federal funding under the IDEA must provide a FAPE to children in their jurisdiction with qualifying disabilities. *Johnson v. Bos. Pub. Schs.*, 906 F.3d 182, 185 (1st Cir. 2018). A FAPE includes "specially designed instruction" for a child with a disability, as well as other "supportive services" that may be required to ensure that the child benefits from the special education program. *Id.* "'The primary vehicle for delivery of a FAPE' is an Individualized Education Program ('IEP')." *Id.* (quoting *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012)).

Program (IEP) or accuses the school of "refusing to provide the educational instruction and services" that the student needs, and whether the plaintiff initially pursued IDEA administrative remedies before filing suit. *Id.* at 758.

The School Department argues that the McCanns were required to exhaust administrative procedures under the IDEA because the complaint alleges a "failure to provide JM with an education that meets his needs," and, therefore, its gravamen is the denial of a FAPE. ECF No. 9 at 9. The McCanns respond that the complaint does not implicate the denial of a FAPE because the gravamen of the complaint is disability discrimination. The thrust of the Section 504 claim, they assert, is that the School Department "discounted the seriousness of the reports" of bullying and harassment by J.M. and his parents because it "regard[ed] them as manifestations of J.M.'s disability." ECF No. 14 at 11. Because the School Department did not take the reports seriously, the McCanns argue, "the harassment persisted and J.M. was brutally assaulted in school." *Id.* at 9.

When determining whether the gravamen of a complaint is the denial of a FAPE, "a court should attend to the diverse means and ends of the statutes covering persons with disabilities—the IDEA on the one hand, the ADA and Rehabilitation Act (most notably) on the other." *Fry,* 137 S. Ct. at 755. The goal of the IDEA is "to provide each child with meaningful access to education by offering individualized instruction and related services appropriate to her 'unique needs.'" *Id.* (quoting 20 U.S.C.A. § 1401(29) (West 2019)). "By contrast, . . . § 504 of the Rehabilitation Act . . . aim[s] to root out disability-based discrimination, enabling each covered person . . . to participate equally to all others in public facilities and federally funded

programs." *Id.* at 756. "A school's conduct . . . might injure [a child with a disability] in ways unrelated to a FAPE, which are addressed in statutes other than the IDEA." *Id.* at 754. In other words, it is possible for a school to comply with its obligations under the IDEA and yet still violate a student's rights under Section 504 of the Rehabilitation Act.

The facts of *Fry* itself provide a helpful illustration of such a situation. At issue in that case was an elementary school's refusal to allow a student with severe cerebral palsy, E.F., to bring her service dog to school. 137 S. Ct. at 751-52. Instead, as part of E.F.'s IEP, the school provided E.F. with a human aide to assist her during the school day. *Id.* at 751. The Frys sued the school, alleging that the school's exclusion of E.F.'s service dog violated E.F.'s rights under the ADA and Section 504 of the Rehabilitation Act. *Id* at 751-52. The school moved to dismiss on the ground that the Frys were required to exhaust administrative remedies under the IDEA before bringing suit; the district court granted the school's motion to dismiss and the Sixth Circuit affirmed. *Id.* at 752. The Supreme Court vacated the Sixth Circuit's decision, observing that "[t]he Frys' complaint allege[d] only disability-based discrimination" and did not challenge, either implicitly or explicitly, "the adequacy of the special education services E.F.'s school provided." *Id.* at 758. Rather, the Frys argued that the school had discriminated against E.F. because of her disability, even though E.F.'s educational needs were being met. *Id.*

The same can be said here. The complaint alleges only disability-based discrimination and makes no mention of an IEP, nor does it challenge the adequacy of the educational services that J.M. received. Instead, the complaint takes aim at

the School Department's response to J.M.'s reports of harassment, alleging that those reports were minimized or disregarded because they were viewed as manifestations of J.M.'s disability. The school had a Section 504 Plan in place for J.M., which provided J.M. with accommodations based on his ADHD and anxiety, *see* ECF No. 1 ¶¶ 7-8, 23, and the complaint does not allege that those accommodations were inadequate to meet J.M.'s educational needs. Rather, the complaint alleges that the School Department failed to respond to J.M.'s reports of harassment because of his disability. That omission, the McCanns argue, led to the continued harassment of J.M. by other students and, ultimately, him being assaulted while at school. ECF No. 14 at 8-9.

Because the gravamen of the complaint is not the denial of a FAPE, the McCanns were not required to exhaust administrative remedies under the IDEA and *Fry* before bringing suit.

### 2. Merits of the Section 504 Claim

To state a plausible claim under Section 504 of the Rehabilitation Act, the complaint must allege (1) that J.M. is an individual with a disability, (2) that he is otherwise qualified to receive the benefits of a program (3) that received federal financial assistance, and (4) that he was denied the benefits of the program solely by reason of his disability. *See* 29 U.S.C.A. § 794(a).[9] The complaint alleges, and the

---

[9] Section 504 of the Rehabilitation Act provides, in relevant part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of . . . his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

*Id.*

School Department does not dispute, that J.M. has a disability as defined in Section 504, specifically ADHD and anxiety, and that the School Department receives federal funding. The complaint also alleges that J.M. was an enrolled student, from which I infer that J.M. was "qualified" to receive the benefits of the educational programs at his respective schools. Therefore, I conclude that the complaint plausibly pleads the first three required elements under Section 504 and turn to the fourth element: whether the complaint plausibly pleads that J.M. was denied the benefits of the School Department's educational program solely by reason of his disability. The School Department argues that the complaint falls short in this regard. ECF No. 9 at 12-13.

"An individual with a disability is excluded from, denied the benefits of, or otherwise subjected to discrimination under a program 'solely by reason of . . . his disability' if: (1) there is a 'causal connection' between his disability and the discriminatory action; and (2) his disability was 'the only cause' of the discriminatory action." *Shaikh v. Tex. A&M Univ. Coll. of Med.*, 739 F. App'x 215, 222 (5th Cir. 2018) (quoting *Sedor v. Frank*, 42 F.3d 741, 746 (2d Cir. 1994)); *see also Leary v. Dalton*, 58 F.3d 748, 752 (1st Cir. 1995) ("Section 504 . . . continues to require a showing that the plaintiff's disability was the *sole* reason for the defendant's adverse action."). The complaint alleges that the School Department "knew that J.M.'s disability manifested in heightened fear and anxiety stemming from repeated acts of bullying and harassment" and that J.M. and his parents reported harassment and threats of physical violence by other students. ECF No. 1 ¶ 60. The McCanns argue that the School Department's failure to intervene was discrimination based on J.M.'s

disability because J.M.'s heightened anxiety around bullying caused the School Department not to take his reports seriously. The complaint alleges that the School Department's failure to act "denied J.M. an equal opportunity to participate in programs and services free from harassment or assault." *Id.* ¶ 61.

Based on the facts alleged in the complaint, it is plausible that the School Department "discounted the seriousness" of J.M.'s reports of bullying and harassment because it regarded the reports as manifestations of J.M.'s disability. ECF No. 14 at 11. The complaint plausibly alleges, therefore, that the School Department's failure to fully investigate and address J.M.'s reports was because of J.M.'s disability. "The possibility of additional, or alternative, reasons for the . . . decision does not detract from the plausibility of [the] allegation" that J.M.'s disability was the "sole reason" for the School Department's response (or lack thereof). *Shaikh*, 739 F. App'x at 223.

Finally, the School Department argues that because J.M.'s physical injuries and three-month absence from school resulted from an assault by another student, J.M. was not denied the benefits of his school's educational program solely because of his disability. ECF No. 9 at 12-13. That argument, however, does not account for the fact that the alleged deprivation includes not only J.M.'s absence from school, but also the period when he was still attending school while allegedly enduring harassment by his peers. *See* ECF No. 1 ¶ 61. It is plausible to infer from the complaint that the School Department's failure to intervene, which was allegedly because of J.M.'s disability, is an earlier link in the causal chain that led to the assault. Therefore, the

fact that J.M.'s physical injuries were caused by another student does not mean that the alleged discrimination did not occur "solely by reason of his disability."

The complaint thus states a plausible claim for relief under Section 504 of the Rehabilitation Act.

## C.    Fourteenth Amendment Claim

"Section 1983 establishes a civil cause of action for the deprivation of constitutional rights." *García-González v. Puig-Morales*, 761 F.3d 81, 87 (1st Cir. 2014) (citing 42 U.S.C.A. § 1983 (West 2019)).  The statute "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred . . . ." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).  Therefore, a plaintiff bringing suit under Section 1983 must allege the denial of a substantive right guaranteed by the U.S. Constitution or a federal statute.  *García-González*, 761 F.3d at 87.  The complaint alleges that the School Department infringed J.M.'s rights to substantive due process and equal protection under the Fourteenth Amendment of the U.S. Constitution[10] by (1) failing to comply with or enforce anti-bullying and harassment laws and policies, and (2) failing to adequately train or supervise employees regarding their obligation to "properly investigate and address incidents [of] bullying, harassment, or assault in public schools."  ECF No. 1 ¶ 66.

### 1.   Substantive Due Process

"To establish a substantive due process claim, a plaintiff must show not only a deprivation of a protected right but also that 'the deprivation of this protected right

---

[10]  The Fourteenth Amendment states, in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

was caused by governmental conduct.'" *Morgan*, 823 F.3d at 742 (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir. 2005)). "As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). The McCanns assert, however, that their claim falls within an exception to that rule: the state-created danger theory. *See* ECF No. 14 at 13. Under the state-created danger theory, the Due Process Clause may be implicated "where a state official acts so as to create or even markedly increase a risk to an individual."[11] *Morgan*, 823 F.3d at 743 (internal alteration and quotation marks omitted) (quoting *Hasenfus v. LaJeunesse*, 175 F.3d 68, 73 (1st Cir. 1999)).

To state a claim under the state-created danger theory, a plaintiff must meet two demanding requirements: "[i]n addition to alleging a sufficient state-created danger," the alleged state action "must shock the conscience of the court." *Irish*, 849 F.3d at 526 (quoting *Rivera*, 402 F.3d at 35). Here, the School Department's alleged actions do not shock the conscience. Generally, conduct by a state actor will be "so egregious" and "outrageous" that it shocks the conscience when the act was both "intended to injure in some way" and "unjustifiable by any government interest." *Rivera*, 402 F.3d at 36 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 849 (1998)). The complaint does not allege that the School Department acted purposefully with an intent to injure J.M.; rather, it alleges that the School Department failed to take J.M.'s reports of harassment seriously and to respond to

---

[11] Although the First Circuit has recognized the existence of the state-created danger theory, it "ha[s] never found it applicable to any specific set of facts." *Irish v. Maine*, 849 F.3d 521, 526 (1st Cir. 2017).

threats by other students.[12]  Therefore, the complaint fails to state a claim under the Due Process Clause of the Fourteenth Amendment.

### 2.  Equal Protection

"To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Davis v. Coakley*, 802 F.3d 128, 132-33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). The complaint does not allege either that J.M. was treated differently than other similarly situated students with disabilities, or that the School Department's actions were based on the types of impermissible considerations described above.  Therefore, the complaint fails to state a claim under the Equal Protection Clause of the Fourteenth Amendment.

---

[12] The facts of *Rivera* provide an illustrative example of a failure to act that, although tragic, did not rise to the level of conscience shocking.  *See* 402 F.3d at 30-33.  In that case, the police promised to protect a fifteen-year-old girl who had agreed to testify at a murder trial, but she was shot and killed in front of her house to keep her from testifying by someone acting at the direction of the criminal defendant.  *Id.* at 30.  The First Circuit noted, "[t]he Supreme Court has said that only in very rare situations will the state's failure to protect someone amount to a constitutional violation, even if the state's conduct is grossly negligent," and ultimately concluded that *Rivera* was "not one of those rare cases."  *Id.* at 31.

### III.  CONCLUSION

For the reasons stated above, it is **ORDERED** that York School Department's Motion to Dismiss (ECF No. 9) is **DENIED IN PART**, as to Counts I and II, and **GRANTED IN PART**, as to Count III.  Count III is therefore **DISMISSED**.

**SO ORDERED.**

**Dated this 11th day of February, 2019**

/s/ **JON D. LEVY**
**CHIEF U.S. DISTRICT JUDGE**